UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ONPOINTE COMMUNITY CARE LV LLC *et al.*,

          Plaintiffs,

   vs.

CHARTER HEALTH HOLDINGS, INC.,

          Defendant.

Case No.: 2:22-cv-01235-GMN-DJA

**ORDER**

     Pending before the Court is the Motion to Enforce Review and Dispute Procedure, (ECF No. 22), filed by Defendant Charter Health Holdings, Inc. ("Defendant"). Plaintiffs OnPointe Community Care LV LLC ("OnPointe"), JWR Management LLC ("JWR"), and John Rittenour ("Plaintiffs") filed a Response, (ECF No. 33), to which Defendant filed a Reply, (ECF No. 34).

     For the reasons set forth below, the Court DEFERS ruling on Defendant's Motion to Enforce Review and Dispute Procedure.

**I.**    **BACKGROUND**

     This action arises from Defendant's alleged breach of the terms of a Securities Purchase Agreement ("SPA") it entered into with Plaintiffs. (*See generally* Compl., ECF No. 1). Pursuant to the SPA, Defendant agreed to purchase St. Luke's Home Hospice, LLC, ("St. Luke"), a Las Vegas based hospice care provider, from OnPointe. (*Id*. ¶ 1). As part of the SPA, OnPointe would be entitled to either a one-time payment of $750,000 or the issuance of

///

///

"Earnout Interests"[1] from Defendant if St. Luke's 2020 EBITDA[2] met or surpassed $250,000 (the "EBITDA threshold"). (*Id.* ¶¶ 18–27).

Section 2.8(b) of the SPA provided the process for determining whether OnPointe met the EBITDA threshold would start when Defendant delivered to OnPointe a calculation of the "2020 Earnout EBITDA" "within sixty 60 days after the finalization of [Defendant's] audited financial statement for the calendar year ending December 31, 2020." (SPA at 13–14, Ex. A to PI). This provision further obligated Defendant to accompany its EBITDA total with "reasonable details supporting" its calculation. (SPA at 14, Ex. A to PI); (Compl. ¶ 30). If OnPointe challenged Defendant's EBITDA calculation, the SPA provided that OnPointe "shall be permitted reasonable access . . . to review the books and records of [Defendant] related to the preparation of" Defendant's EBITDA calculation. (SPA at 14, Ex. A to PI); (Compl. ¶ 30). OnPointe was required to notify Defendant of any objections it had to the EBITDA calculation within thirty (30) days after delivery of the final EBITDA calculation. (SPA at 14, Ex. A to PI).

The final sentence of Section 2.8(b) provided that "[s]ubject to the last sentence of Section 2.8(d) of the [SPA], any disputes regarding the 2020 Earnout EBITDA Calculation . . . shall be finally determined in accordance with the review and dispute procedures provided in Section 2.3(c) of th[e] [SPA]." (*Id.*, Ex. A to PI). The last sentence of Section 2.8(d) stated that OnPointe agreed "in the event that any of the Earnout Covenants shall be breached, [OnPointe's] sole and exclusive remedy shall be a claim or [a]ction . . . seeking to recalculate

---

[1] SPA Section 2.8(c) defines "Earnout Interests" as the "number of shares of Series A-2 Preferred Stock of the Buyer with an aggregate fair market value as of the date of issuance to the Earnout Amount as determined by the board of directors of Buyer in its reasonable discretion, which Earnout Interests Buyer is to deliver to Seller pursuant to the terms of this Agreement as a portion of the Purchase Price upon the satisfaction of the terms and conditions as set forth in Section 2.8." (SPA at 70, Ex. A to Mot. Prelim. Inj. ("PI"), ECF No. 8-1).

[2] SPA Section 2.8(a)(ii) defines EBITDA as the "Buyer's earnings before interest, taxes, depreciation and amortization (on a consolidated basis) with respect to its operations in the state of Nevada for the calendar year ending December 31, 2020, as derived from the audited financial statements of Buyer for the calendar year ending December 31, 2020, prepared in accordance with GAAP." (SPA at 13, Ex. A to PI).

and/or appropriately adjust the 2020 Earnout EBITDA, and" OnPointe shall not "have a right to specifically enforce compliance with the Earnout Covenants." (*Id.* at 15, Ex. A to PI).

Section 2.3(c), in turn, provided that any disputes surrounding Defendant's calculation of the Cash on Hand and/or Net Working Capital shall be referred to "a nationally or regionally recognized certified public accounting firm mutually selected by [OnPointe] and [Defendant] (the 'Independent Accountants') for resolution[.]" (*Id.* at 9, Ex. A to PI). Section 2.3(c) explained the Independent Accountants' determinations "will be final, binding and conclusive on the Parties[.]" (*Id.* at 9, Ex. A to PI). The parties do not dispute the reference to Section 2.3(c) in Section 2.8(b) evidence the Independent Accountants will resolve any dispute resolving the 2020 EBITDA Calculation. (*See generally* Mot. Enforce, ECF No. 22); (Resp., ECF No. 34).

The sale between the parties closed on February 10, 2020. (Compl. ¶ 33). From this date forward, Plaintiffs allege that Defendant engaged in a campaign of misdirection and delay in violation of the SPA by refusing to complete its audited financial statement for 2020 to begin the EBITDA finalization process, failing to provide reasonable details supporting any preliminary EBITDA calculation it gave OnPointe, and denying OnPointe access to its books and records when it challenged the preliminary EBITDA calculation it received. (*Id.* ¶¶ 34–69).

On August 1, 2022, Plaintiffs filed the present Complaint alleging the following causes of action: (1) breach of contract – failure to provide access to books and records; (2) breach of the implied covenant of good faith and fair dealing – failure to provide access to books and records; (3) breach of contract – failure to pay earnout; (4) breach of the implied covenant of good faith and fair dealing – failure to pay earnout; (5) fraud; (6) fraudulent inducement; (7) unjust enrichment; (8) declaratory relief; and (9) injunctive relief. (Compl. ¶¶ 70–157). Defendant subsequently filed the instant Motion to Enforce Dispute and Review Procedure, which the Court discusses below.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy" arising out of the contract or transaction "shall be valid, irrevocable and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract."[3] 9 U.S.C. § 2. Pursuant to the FAA, the court should stay an action and compel arbitration when, in a pending suit, "any issue is referable to arbitration." 9 U.S.C. §§ 3, 4. A district court also has the discretion to dismiss an action if all the issues raised are arbitrable and must be submitted to arbitration. *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004) (citing cases).

---

[3] The parties do not address whether the FAA applies to the SPA. Nevertheless, for the reasons set forth below, the Court finds the terms of the SPA as it relates to the sale of St. Luke implicate "commerce," thereby falling under the purview of the FAA. The FAA defines "commerce" to mean "among the several States or with foreign nations . . . ." 9 U.S.C. § 1. The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (quoting *Allied-Bruce Terminix Cos. Inc.*, 513 U.S. 265, 273–74 (1995)). This means "that the FAA encompasses a wider range of transactions than those actually in 'in commerce'—that is, 'within the flow of interstate commerce.'" *Id.* (quoting *Allied-Bruce*, 513 U.S. at 273).

Here, Plaintiffs are citizens of Nevada and Arizona. (Compl. ¶¶ 6–8). Defendant is a Delaware corporation with its principal place of business in California. (*Id.* ¶ 9). The SPA involves an exchange of money for property in Nevada, namely St. Luke hospital, between residents of different states. Such a transaction between residents of different states involves interstate commerce. *See Welton v. State of Missouri*, 91 U.S. 275, 280 (1875) ("Commerce comprehends intercourse for the purpose of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different states); *see also Mayorga v. Ronaldo*, 491 F. Supp. 3d 840, 848 (D. Nev. 2020). Furthermore, the continued operation of St. Luke implicates commerce because the hospital presumably treats patients from all over the country, and it receives payments from individuals and entities other than Nevada residents. *See Montes v. San Joaquin Community Hospital*, No. 1:13-cv-01722, 2014 WL 334912, at *5 (E.D. Cal. Jan. 29, 2014) (concluding that an employment contract between plaintiff and a hospital was governed by the FAA because the hospital's activities were involved in interstate commerce); *Abdullah v. Duke University Health System, Inc.*, No. 5:09–CV–8–FL, 2009 WL 1971622, *3 (E.D.N.C. July 8, 2009) (finding that an employment contract between a hospital and the plaintiff "involve[d] interstate commerce because DUHS treats patients from all over the country and the world, it receives payments from individuals and entities other than North Carolina residents, and its employees travel outside of North Carolina"). Accordingly, federal arbitrability law governs the parties arbitration agreement.

Before a court can compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (2003), the court must determine (1) whether the parties entered into a valid arbitration agreement, and (2) whether the relevant dispute is arbitrable, meaning that it falls within the language of the arbitration agreement. *See John Hancock Mutual Life Insurance Co. v. Olick*, 151 F.3d 132, 137 (3d Cir.1998) (stating that where a dispute regarding an arbitration agreement is brought before a district court, the scope of the court's authority to become involved is defined by the FAA).

With respect to the first inquiry (or "step one"), courts apply "ordinary state-law principles that govern the formation of contracts."[4] *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009); *see also Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 500 (D. Del. 2010). With regard to the step two question—whether the dispute between the parties falls within the scope of the valid arbitration agreement—the court utilizes federal law. *Id.* at 524. In addition, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, (1983); *see First Liberty Inv. Gp. v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir. 1998); *Stateside Mach. Co. v. Alperin*, 591 F.2d 234, 240 (3d Cir. 1979) ("Doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration").

## III. DISCUSSION

Defendant asserts the Court should stay the case and enforce the SPA's review and dispute resolution procedure regarding the 2020 Earnout EBITDA Calculation. (Mot. Enforce Review 4:3–9, 8:3–9:10). In response, Plaintiffs do not attack the validity of the arbitration clause contained in the SPA, (Resp. 2:18–20, 4:11–16, ECF No. 34), but raise two arguments

---

[4] Pursuant to Section 9.10 of the SPA, "all Actions arising in whole or in part under or in connection with this Agreement, are to be governed by and construed in accordance with the domestic substantive laws of the State of Delaware . . ." (SPA at 56, Ex. A to PI). Accordingly, the Court applies Delaware law below.

why application of the SPA's dispute resolution procedure is unjustified.[5] First, Plaintiffs contend Defendant prematurely raised the SPA's arbitration procedure because Defendant has not completed the conditions precedent necessary to trigger this procedure. (Resp. 8:11–11:5). Second, Plaintiffs contend that even assuming Defendant's argument surrounding the SPA's review and dispute resolution procedure is ripe, the Court should not stay this case because they have asserted claims that exceed the scope of the review and dispute resolution procedure.[6] (*Id.* 4:17–8:10). Here, the Court's analysis begins and ends with Plaintiffs conditions precedent argument.

Plaintiffs aver the SPA's Independent Accountant provision is not triggered because Section 2.8(b) first required Defendant to: (1) submit its final 2020 EBITDA calculation; (2) provide OnPointe with reasonable details supporting its EBITDA calculation; and (3) permit

---

[5] Even if Plaintiffs had raised this issue, the Court finds Section 2.3(c) of the SPA contains a valid arbitration provision. As stated, Section 2.3(c) provides that any disputes surrounding Defendant's calculation of the Cash on Hand and/or Net Working Capital shall be referred to "a nationally or regionally recognized certified public accounting firm mutually selected by [OnPointe] and [Defendant] (the 'Independent Accountants') for resolution[.]" (SPA at 9, Ex. A to PI). This provision further states the Independent Accountants' determinations "will be final, binding and conclusive on the Parties[.]" (*Id.* at 9, Ex. A to PI). "Delaware courts have referred to contractual language stating that an accounting firm's determination is 'final and binding on all parties' as 'arbitration-style language[.]'" *Bus Air, LLC v. Anthony R. Woods and E3Rivers, LLC*, No. 19-cv-1435, 2021 WL 9598626, at *12 (D. Del. Jan. 28, 2021); *Sapp v. Industrial Action Services, LLC*, No. 19-cv-912, 2020 WL 2813176, at *3 (D. Del. May 29, 2020) ("Section 2.3(e) of the agreement states that the accounting firm's resolution becomes 'final and binding.' Empowering a third party with the authority to make a 'final and binding' determination is the purpose of arbitration.") (citation omitted); *Agiliance, Inc. v. Resolver SOAR, LLC*, No. 2018-cv-0389, 2019 WL 343668, at *4 (Del. Ch. Jan. 25, 2019) (finding that a dispute resolution provision requiring submission of the parties' disputes "for arbitration by a nationally-recognized accounting firm" constituted an agreement to arbitrate); *Yeransian v. Markel Corp.*, No. 16-cv-808, 2017 WL 3225987, at *6 (D. Del. July 31, 2017) ("While not a traditional arbitration agreement—in that it never mentions an arbitrator or the term arbitrate—Section 3.2(d) of the CVR is still a contractually agreed upon dispute resolution process by which an Independent Actuary determines the final and binding Adjusted Principal Amount."). While Section 2.3(c) does not explicitly use the term arbitration, the use of language requiring the parties submit their dispute with respect to Cash on Hand/and or Net Work Capital to the binding determination of a third-party accounting firm evinces an intent to arbitrate. *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 576 (S.D.N.Y. 2014) ("While Section 2.8 does not use the term 'arbitration,' it requires the parties to submit their dispute with respect to working capital 'to the binding determination of a third party accounting firm.'"); *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985) ("No magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of the [Federal Arbitration] Act.").

[6] Because the Court defers ruling on Defendant's Motion based on Plaintiffs first argument, it declines to examine their second argument.

Plaintiffs reasonable access to its books and records related to its preparation of its final 2020 EBITDA calculation. (Resp. 8:11–23).

  Section 2.8(b) states:

> Within sixty (60) days after the finalization of [Defendant's] audited financial statements for the calendar year ending December 31, 2020, [Defendant] shall submit to [Plaintiffs] in writing [Defendant's] calculation of the 2020 Earnout EBITDA (the "2020 Earnout EBITDA Calculation") and whether the 2020 Contingent Amount is owed, together with reasonable details supporting [Defendant's] determination of such 2020 Earnout EBITDA Calculation. After delivery of the 2020 Earnout EBITDA Calculation, and until any dispute with respect thereto is finally resolved, [Plaintiffs] and its accountants shall be permitted reasonable access, during normal business hours and upon reasonable notice, and subject to customary confidentiality agreements, to review the books and records of [Defendant] related to the preparation of such 2020 Earnout EBITDA Calculation. If, within thirty (30) days following delivery of the 2020 EBITDA Calculation, [Plaintiffs] ha[ve] not given [Defendant] written notice of any good faith objection to such 2020 Earnout EBITDA Calculation (which notice shall state in reasonable detail the basis of such objection, the matters in dispute and the amount of any proposed adjustments), then such 2020 Earnout EBITDA Calculation shall be deemed final and shall be binding and conclusive on [Defendant] and [Plaintiffs] for all purposes and not subject to further dispute or challenge. Subject to the last sentence of Section 2.8(d) of this Agreement, any disputes regarding the 2020 Earnout EBITDA Calculation or the 2020 Contingent Amount shall be finally determined in accordance with the review and dispute procedures provided in Section 2.3(c) of this Agreement.

(SPA at 14, Ex. A to PI). At its core, Plaintiffs position hinges on their interpretation that the first sentence of Section 2.8(b) imposes a condition precedent which is only precipitated by Defendants providing its final 2020 Earnout EBITDA Calculation.

  Here, Defendant does not dispute it only provided Plaintiffs with its "preliminary" 2020 Earnout EBITDA Calculation rather than its final 2020 Earnout EBITDA Calculation. (Mot. Stay Case 7:16–22, 14:20–22). However, Defendant represents it is willing "finalize the 2020 Earnout EBITDA Calculation" if "the Court or the circumstances surrounding this litigation require it[.]" (*Id.* 7:16–21); (*see* Reply

6:27–38) ("[I]f Plaintiffs insist that [Defendant] finalize the 2020 Earnout EBITDA Calculation . . . it can, but that calculation would decidedly not result in Plaintiffs' earning the 2020 Contingent payment."). Defendant's willingness to finalize the 2020 EBITDA Calculation if directed is curious, and more than a little suspect.

Defendant maintains in its filings it already completed the alleged conditions precedent identified by Plaintiffs as part of its preliminary 2020 EBITDA Calculation, (Mot. Enforce Review 10:1–10); (Reply 6:5–15). But if Defendant already completed the process identified by Plaintiffs, it is unclear why Defendant needs direction from the Court to merely change the title of its calculation from preliminary to final to utilize the SPA's arbitration procedure. Indeed, for months Defendant has been aware the only issue preventing it from utilizing the arbitration procedure is this stylistic change. And yet, for months, Defendant has been unwilling to change the form of its 2020 EBITDA Calculation despite contending the substantive process was completed. In light of the foregoing, the Court is skeptical whether Defendant is truly willing to finalize the 2020 EBIDTA Calculation. Nevertheless, despite the Court's skepticism, it would be premature for the Court to decide Plaintiffs conditions precedent argument if Defendant is willing to resolve it without the Court's intervention by finalizing its 2020 EBITDA Calculation.

Accordingly, the Court will DEFER ruling on Defendant's Motion to Enforce Review and Dispute Procedure.[7]

---

[7] The Court will also DEFER ruling on Defendant's pending Partial Motion to Dismiss, (ECF No. 23). If this case does go to arbitration, the Independent Accountants' determination regarding the 2020 Earnout EBITDA Calculation will necessarily impact Plaintiffs' causes of action. *See Catalyst Pharma Group, Inc. v. Icon Clinical Research, Inc.*, No. 09-cv-391, 2010 WL 1286184, at *2 (D. Del. Mar. 31, 2010) ("If the Independent Accounting Firm calculates EBITDA consistently with ICON, it may be difficult for Catalyst to prove fraudulent conduct. If the Independent Accounting Firm calculates EBITDA substantially higher than ICON, not only may Catalyst be entitled to a Contingent Payment based on that higher calculation, but Catalyst may have further support for its allegations of fraudulent conduct by ICON.").

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Court **DEFERS** ruling on Defendant's Motion to Enforce Review and Dispute Procedure, (ECF No. 22).  **IT IS FURTHER ORDERED** that the parties file a Joint Status Report within thirty (30) days of this Order informing the Court of the status of their dispute.  In the Joint Status Report, Defendant must inform the Court whether and when it plans to produce its final 2020 EBITDA Calculation.

**DATED** this __20__ day of June, 2023.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT